OPINION OF THE COURT
John M. Hunt, J.
The plight of this broken family is painful, its fate apparently final. The facts of this case are uniquely disturbing in this court’s experience, a sad by-product of a dysfunctional legal process and a mechanical foster care system. Ideally, Family Court and foster care exist to protect children and reunite them with their parents. Here, neither goal was accomplished. Instead, a systematic, catastrophic failure by these institutions made the G. family’s situation worse. Despite ample evidence supplied by multiple mental health professionals since the children’s first foster care placement in 2008, neither the Family Court nor the foster care agency charged with caring for them recognized the obvious existence of parental alienation. As a result, notwithstanding nine years of foster care placement, the unchecked and corrosive effect of parental alienation has made family reunification impossible in this case.
This court’s familiarity with the G. family dates back to 2013, by which time the children had been in a foster care placement for five years and their parental alienation was in full effect. At that time, the court was assigned to conduct the first of two lengthy trials involving the children. That first trial resulted in the 2013 dismissal of a termination of parental rights (hereinafter TPR) trial brought by a foster care agency[1] against Mr. G. on the implausible ground that he had permanently neglected his children since they refused to visit with him. In short, the agency’s theory was that Mr. G. was to be blamed for his children’s alienation against him. This dismissal thwarted the agency’s long-standing plan to have the children adopted by T.H., who had been their foster parent since their original placement. Sadly, there was a permanency plan, but the children’s father, L.N.G., was not a part of it.
Since the 2013 dismissal of the TPR made the children’s adoption impossible, foster parent H. filed this latest petition in which she now seeks to be appointed the kinship guardian *665 of Mr. G.’s son and daughter. She has been represented by private counsel and supported throughout by both the foster care agency and the Attorney for the Children, each of whom had supported the original TPR petition. A trial of this kinship guardianship petition took place over the course of nine court days during which multiple witnesses testified. In light of this family’s near decade long entanglement in Family Court and the foster care system, it is necessary to summarize the facts and prior proceedings that have brought the parties to this sad, unfortunate end.
Nearly 10 years ago, on October 15, 2007, L.N.G. filed custody petitions in Kings County Family Court in which he sought custody of his children, five year old N. and four year old T. In his petitions, he alleged that the children’s mother, C.C., was smoking crack cocaine and that she and the children were residing with her paramour, S.H., also known as S.C.H., who had only recently been released from prison after having served a lengthy sentence for rape.[2] After Mr. G. filed his custody petitions, he was ordered to have supervised therapeutic visits with N. and unsupervised visitation on Saturdays from 10:00 a.m. to 3:00 p.m. with T.
An Administration for Children’s Services (hereinafter ACS) investigation prompted by the allegations in Mr. G.’s custody petitions ultimately led to the filing of neglect petitions in Queens County Family Court against C.C. and S.C.H.[3] with respect to the children.[4] Significantly, Mr. G. was not a named respondent in that neglect proceeding, nor was he ever named as a respondent in any other neglect proceeding involving the children. Yet, upon the children’s removal from C.C., ACS did not seek to place them with Mr. G. who, at the time, was living in a men’s shelter. Nor did they attempt to help Mr. G. obtain suitable housing, the most significant barrier to the release of his children to him. Instead, for reasons best known to ACS, the children were placed in “kinship”[5] foster care with a *666 complete stranger, T.H. Ms. H. is a career foster parent,[6] who though biologically and legally unrelated to the children, was considered “kin” by ACS since she was “coincidentally” the sister of S.C.H., the registered sex offender, who was the focus of the neglect proceeding and against whom an order of protection had been issued in the children’s favor. While his children were placed in foster care with Ms. H., Mr. G. was ordered to have unsupervised visitation on Saturdays from 10:00 a.m. to 3:00 p.m. with T. only. This order superseded the temporary visitation order issued in Mr. G.’s custody proceedings.
Shortly after the children were placed in T.H.’s care as part of the neglect proceedings, she began to report concerns about Mr. G.’s unsupervised visits with T. T.H. told the caseworker that every time T. returned from a visit with her father, she reeked of cigarette smoke, and appeared tired and disheveled. When the caseworker spoke to T., she mimicked her foster mother’s story. This was apparently the beginning of the slow but steady manipulation of the children’s fragile minds against their father.
Two weeks after T.H. voiced her concerns, Mr. G.’s visitation was limited by a court order to therapeutic visitation with N. and ACS discretion as to visits with T. A month later, a further court order limited Mr. G.’s contact with his children to once a week ACS supervised visitation and therapeutic visitation with the children. Unbeknownst to Mr. G., he would never visit with his children in an unsupervised setting again.
In June 2009, T.H. requested, ACS permitted, and Mr. G. consented to, a 3V2 week vacation for the children with their foster parent in Virginia. Although the attitude of both children seemed different upon their return, they still reacted positively while in the company of their father.
On November 10, 2009, another Queens County Family Court Judge, no longer sitting, entered neglect findings against S.C.H. On that same date, without notice and without Mr. G.’s assigned attorney present, that judge summarily suspended Mr. G.’s visits with his children. That decision was based upon a single New York Psychotherapy and Counseling Center letter that indicated the continuation of Mr. G.’s therapeutic visits was contraindicated. The letter, sent by the Director of Program *667 Operations and General Counsel, completely contradicted other contemporaneous reports which established that Mr. G. had been doing everything right,[7] and that his therapeutic visits with the children had been going well.[8] The family service progress notes show that prior to the suspension of visits between the children and Mr. G., the agency supervised visits had also been positive.[9] Moreover, one month prior to the suspension of his visits, the case record reports that visits between the children and their father were positive and appropriate, and that *668 the children were happy to see Mr. G. However, during home visits, uncharacteristically, both children expressed different attitudes towards their father. During one of the home visit interviews with their case planner, both children stated that they did not want to see Mr. G. at all, that they were afraid of him, and for the first time started to make statements accusing Mr. G. of acts of domestic violence towards their mother that had occurred years earlier, prior to their placement in foster care. Around that same time, T.H. began to report to the case worker that the children were experiencing nightmares and bed-wetting after visiting with their father.
It is this court’s opinion that the only explanation for this sea change in the children’s attitudes towards their father—in statements and behaviors—was that these young children were influenced by adults during the course of their foster care placement. The children’s statements about their father while being interviewed in T.H.’s home were clearly dissimilar to the children’s behavior while at agency supervised visits and during therapeutic visits with their father. Unsurprisingly, as the neglect proceedings advanced against C.C. and S.C.H., T.H.’s claims of the children’s fear, resentment and troubling behaviors increased exponentially. Sadly, after Mr. G.’s visits were suspended, the children’s statements about their father gradually changed to disdain.
On December 1, 2009, another Family Court Judge entered neglect findings against C.C.[10] On January 9, 2009, a disposi-tional order was entered against her. On March 18, 2010, a dispositional order was entered against S.C.H., which included the issuance of an order of protection directing S.C.H. to stay away from the children until their eighteenth birthdays. As the neglect case came to a close, Mr. G.’s visits with his children had still not been reinstated, foreclosing any opportunity for Mr. G. to strengthen any bond there may have been with his children.[11]
*669 On September 23, 2010, the foster care agency filed petitions seeking to terminate C.C.’s and Mr. G.’s parental rights to the children, alleging permanent neglect causes of action against them.
Despite the absence of any neglect petition or neglect finding against him, the foster care agency’s theory of their TPR against Mr. G. was that there was an ongoing pattern of failed contact between him and his children, and that Mr. G. failed to appropriately benefit from agency provided services such that he was unable to develop a relationship with his children. The foster care agency focused their case on a time period after Mr. G.’s visits had been suspended, purposefully discounting the preceding time period during which Mr. G.’s relationship with his children had been progressing.[12]
On January 20, 2011, C.C. settled her portion of the TPR against her by surrendering her parental rights on the condition that the children’s foster mother, T.H., S.C.H.’s sister, adopt them.[13] On November 25, 2013, after a trial, this court dismissed, with prejudice, the TPR proceeding against Mr. G. for failure of the foster care agency to meet their burden of proof. The court found that there was not a scintilla of evidence presented that Mr. G. permanently neglected the children, but rather that he had made countless attempts, to no avail, to maintain a close relationship with his children from which he was thwarted at every turn. These attempts began in 2007 when Mr. G. filed his custody petitions and continued throughout the various Family Court proceedings. There was no dispute that in the hopes of reunification, Mr. G. completed numerous service programs, which he either sought for himself, or ACS recommended to him, and that he located appropriate housing for himself and his children. Although the foster care agency’s early case record is replete with the children’s statements that they enjoyed visiting with their father and reports of their affection towards him, later case records show that their opinion of their father slowly, yet substantially, changed to fear, anger, and negativity as their placement with T.H. continued. The evidence showed that despite the foster care *670 agency’s and T.H.’s[14] apparent lack of enthusiasm towards Mr. G.’s engagement with the children, he persevered in his quest for reunification by making himself available for any type of visits offered to him—when they were offered to him. The court found most significant within the evidence submitted during the TPR trial, expert opinions that the children were coached by way of a confluence of interest between the foster mother, T.H., and the children’s biological mother, C.C., to make sure that Mr. G. was not included in the children’s future.
Unfortunately, another Family Court Judge had ignored the court-ordered reports of mental health professionals who reported that the children had been coached, and that Mr. G. had made great strides to rehabilitate himself and was sincere in his desire for reunification. In one such report, Dr. N.G. Ber-rill recommended that the foster care agency be ordered to begin working aggressively with Mr. G. in a progression of visitation towards release of the children to him. Dr. Berrill described Mr. G. as “the best bet, given what this examiner has learned about the various parties associated with this matter.”[15] By ignoring this forensic evidence, ACS, the foster care agency, the judge, and the Attorney for the Children enabled and then reinforced the alienation of non-respondent Mr. G. from his children by functionally ending his visits. The untold tens of thousands, if not hundreds of thousands, of dollars invested in foster care services and litigation were tragically squandered pursuing the wrong outcome.
By the time therapeutic visitation was re-instituted, it was far too little and much too late. Reunification failed despite multiple efforts to engage the children as there was, by now, a complete and utter breakdown in Mr. G.’s relationship with his son and daughter. N.’s interactions with his father had become extremely hostile; they consisted largely of N. shouting derogatory remarks towards Mr. G. Similarly extreme, but differently manifested, T.’s interactions with her father presented as constant crying and an unwillingness to look at Mr. G.
Notably, while the children languished in foster care, and as the various Family Court petitions were filed, C.C. married S.C.H., the convicted and registered sex offender, thereby *671 converting T.H., the children’s foster mother, into their paternal aunt. Becoming their paternal aunt paved the way for T.H. to file her kinship guardianship petition, which allows the same type of financial benefit outside of the foster care system as she receives while the children are in foster care.[16]
Kinship guardianship is a permanency option which, in many respects, is similar to adoption. (See 42 USC § 670 et seq. [Social Security Act, subch IV, part E]; see also Social Services Law § 458-a et seq.; Family Ct Act §§ 661 [c]; 1017, 1055-b, 1089-a.) Unlike an adoption, it permits a relative to remain a child’s guardian while receiving an ongoing subsidy outside of foster care. (See id.) A relative applies to their local social services district which must approve the subsidy prior to their application for a guardianship designation in court.[17] In other words, it is a local social services district which controls that decision, and not Family Court. Thereafter, a relative applies to a family court by the filing of a petition to be appointed as a child’s guardian.[18] (See 42 USC § 670 et seq. [Social Security Act, subch IV, part E]; see also Social Services Law § 458-a et seq.; Family Ct Act §§ 661 [c]; 1017, 1055-b, 1089-a.)
A family court must hold a hearing, the extent of which is within its discretion, to aid in its decision-making. (See id.) In making its determination, a family court must consider: (l) 'the best interests of the child; (2) whether the relative will provide a safe and permanent home; (3) the relationship between the subject child and the relative seeking kinship guardianship; (4) the subject child’s position; and, (5) there must also be a compelling reason why (a) the child’s return to their parent or parents is not appropriate; and, (b) adoption is not appropriate. (See Family Ct Act §§ 1055-b, 1089-a.) A family court must then either approve or disapprove the goal of kinship guardian *672 ship. If a parent does not consent to the goal of kinship guardianship, a family court must find extraordinary circumstances exist in order to approve the goal. (See Family Ct Act §§ 1055-b, 1089-a.) If a family court approves the goal, the child exits foster care, and the relative receives a monthly subsidy until the child becomes 18 years of age.[19], [20] (See 42 USC § 670 et seq. [Social Security Act, subch IV, part E]; see also Social Services Law § 458-a et seq.; Family Ct Act §§ 661 [c]; 1017, 1055-b, 1089-a.)
When kinship guardianship is in place, a local social services district and, for the most part, Family Court[21] are no longer involved with the child since permanency has been achieved. (Id.) At that point, the guardian can make all necessary decisions for the child, including medical and educational decisions. (Id.) Where the child has not been freed for adoption, his or her birth parents retain their parental rights.[22] (Id.) The child may maintain contact with the parents, including visits, if appropriate to the circumstances. (Id.)
After having considered the testimonial and documentary evidence adduced at the kinship guardianship trial as well as the TPR trial,[23] as well as the parties’ arguments, the court reluctantly grants T.H.’s kinship guardianship petition. Since September 2008, she has been the children’s foster parent. They are bonded to her and she has provided a level of care that has adequately addressed their physical needs. However, her attention to the children’s emotional needs is seriously in question.
*673 The evidence shows that during the course of the children’s 8V2 years in foster care,[24] T.H. has either actively promoted, or acquiesced in, a campaign of parental alienation against Mr. G.[25] This finding is based on conclusive expert testimony presented to the court by Dr. Ellen C. Weld and Dr. Joe Scroppo, as well as the report of a third expert, Dr. Azariah Eshkenazi. Moreover, it is supported by evidence of the children’s unexplained, increasing and apparently permanent hostility towards their father who had voluntarily engaged in every service plan and who made every effort to reunite with them. It is the court’s view that the children could not have been alienated from their father without the collective failure of ACS, the foster care agency, the Attorney for the Children, and the Family Court to recognize what was clearly either the active participation, or passive complicity,[26] of a foster mother in alienating children from their biological father. The court also doubts that T.H. has properly enforced the order of protection issued in the children’s favor against her brother, S.C.H.[27]
There is no place else for the children to live, except with T.H., since their biological mother signed an irrevocable surrender and the children’s minds have been poisoned against their father. Adoption is not appropriate since the children have not been freed. Thus, the court finds that it is in the children’s best interests that T.H. be their kinship guardian with conditions. The ramifications of simply appointing T.H. as a kinship guardian without conditions would effectively cut off all contact between Mr. G. and his children—essentially “terminating” his parental rights while making this court the latest enabler of parental alienation. The court finds that the proposed guardian can not be trusted to act in the best interests of the children with regards to their father. In light of *674 the unique set of facts and circumstances in this case, including the court’s lack of confidence in the proposed guardian’s ability to act responsibly and work towards a relationship between the children and their father, the court is compelled to direct that T.H. comply with definite terms and conditions of kinship guardianship. These terms and conditions shall seek to rectify what the court finds to be—as previously set forth— years of parental alienation from their father while the children were in foster care with T.H.
Therefore, it is ordered that T.H.’s kinship guardianship application is hereby granted under the following terms and conditions: (1) T.H. shall provide Mr. G. with her current address; (2) T.H. shall keep Mr. G. apprised of the children’s whereabouts; (3) T.H. shall not change her residence without either Mr. G.’s consent or court authorization; (4) T.H. shall not leave the state or the country, for any reason, without Mr. G.’s consent and court authorization; (5) T.H. shall consult Mr. G. on all educational decisions as they relate to the children. If there shall be a dispute, the parties shall return to court to resolve such dispute; (6) T.H. shall enroll the children in therapy specifically designed to address the parental alienation they have suffered during the course of the time that they have lived with her in foster care; (7) T.H. shall make the children available for visitation with Mr. G. as recommended by the therapist engaged in addressing their parental alienation; and, (8) T.H. shall enforce the stay away order of protection issued against her brother, S.C.H., in the children’s favor, in effect until their eighteenth birthdays.

. Graham Windham Services to Families and Children.

. The New York Department of Corrections and Community Supervision records show that S.C.H. spent almost 19 years in prison before he was conditionally released to parole.

. ACS alleged that S.C.H. was a person legally responsible for the children’s care.

. Pursuant to the order of the judge presiding over the neglect proceedings, Mr. G.’s custody petitions were transferred to Queens County Family Court to join the neglect proceedings.

. At the time, T.H.’s “kinship” was a fiction since she appeared to have no relationship with the children.

. Ms. H. has been a licenced foster parent for approximately 30 years. She testified that other foster children who had been living with her left only four months prior to the opportunity to foster Mr. G.’s children. (See G. tr at 45 [Aug. 11, 2016].)

. The content of the letter was inconsistent with a permanency hearing report, created two months prior in connection with the neglect proceedings, that showed that non-respondent Mr. G. had regularly attended family visits with his children, complied with all his services, and obtained housing. There was no indication within that report that any issues had arisen in regards to the children’s interactions, or reactions towards, their father. Yet, Mr. G.’s visits were suspended indefinitely without a hearing.

. In direct contravention to the letter, Tanya Draper, the New York Center for Psychotherapy therapist who had been working with the family, testified at the TPR trial that she was not consulted prior to the order suspending visitation. Ms. Draper testified at trial that in her opinion, there was no reason for the sessions to end and she did not request the suspension. Ms. Draper stated that T.H. told her that Mr. G.’s visits had been suspended because the children were reportedly having nightmares about their father and exhibiting other disturbing behaviors that were attributed to their contact with him. She told the court that she did not expect those types of behaviors from the children based upon what she observed in her sessions with them, and described her observations of the children and their father as appropriate. She told the court that during sessions, T. would spontaneously kiss and hug her father, and sit on his lap. She stated that N. did not express affection towards his father in the same way as T, but that he would hug his father, and have conversations with him without exhibiting negativity. Ms. Draper testified that after the children came back from an out of state summer vacation with T.H., the children began to say that they did not want to visit with their father. She further stated that after Mr. G.’s visitation was suspended, the children began to express positions about their father that were completely different from what she had previously heard and were incompatible with what she had seen.

. As an example, on January 26, 2009, the notes report that T.H.’s daughter, N.H., brought both children to visit with Mr. G. at the foster care agency since she was unaware that Mr. G. was limited to therapeutic visits with N. When N. saw his father, he wanted to visit with him and became upset when an attempt was made to stop the visit. Both children were allowed to visit with Mr. G. that day and the notes show that the visit went well. Mr. G. was reported as nurturing towards the children and the children were reported as comfortable with him. T. smiled and hugged her father, and was laughing with him and happy throughout the visit. When T. was interviewed, she stated that she was fine and having fun with her father. The record establishes that during supervised visitation, the children were happy to see their father, were having fun at the visits, and they gave him “many hugs and kisses.”

. Ironically, the law has changed since Matter of Afton C. (James C.) (17 NY3d 1 [2011]), which held that a mother can not be adjudged neglectful of her children by permitting a sexual offender father to return home without proof that father posed an imminent danger to his children. Had the law been what it is today, and had C.C. married S.C.H. sooner, a petition may never have been brought against her and the children may have remained in her care.

. Ironically, Mr. G.’s circumstances have become very much the same as S.C.H.’s.

. It was Mr. G.’s position that the TPR was a legal fiction since the children had been coached and encouraged to make false reports of mistreatment by him, and to falsely express negative reactions towards him so that it became impossible for him to visit with them.

. Although C.C. subsequently appealed these surrenders, they were upheld by the Second Department.

. The case record reports many instances in which Mr. G. arrived for scheduled visits, but T.H. failed to show with the children. The record also reflects T.H.’s expressed concerns about Mr. G.’s contact with the children.

. The New York Center for Neuropsychology & Forensic Behavioral Science Custody/Visitation Evaluation (Berrill, M.D., Oct. 5, 2010).

. Money can not be discounted as the motivation for T.H. to alienate the children from their father. During trial, T.H. testified that she receives $3,100 in foster care funds each month to help support the children. (See G tr at 77 [Aug. 11, 2016].)

. See New York State Office of Children and Family Services, Administrative Directive ll-OCFS-ADM-03, Kinship Guardianship Assistance Program (KinGAP) (rev July 6, 2011), http://onlineresources.wnylc.net/pb/ docs/ll-ocfs-adm-03.pdf, cached at http://www.nycourts.gov/reporter/webdocs/ ll-ocfs-adm-03.pdf; see also http://ocfs.ny.gov/kinship/support_docs.asp.

. See New York State Office of Children and Family Services, Administrative Directive ll-OCFS-ADM-03, Kinship Guardianship Assistance Program (KinGAP) (rev July 6, 2011), http://onlineresources.wnylc.net/pb/ docs/ll-ocfs-adm-03.pdf, cached at http://www.nycourts.gov/reporter/webdocs/ ll-ocfs-adm-03.pdf; http://ocfs.ny.gov/kinship/support_docs.asp.

. Where the subject child entered foster care at 16 years or older, not applicable here, the monthly subsidy continues until the child turns 21.

. See New York State Office of Children and Family Services, Administrative Directive ll-OCFS-ADM-03, Kinship Guardianship Assistance Program (KinGAP) (rev July 6, 2011), http://onlineresources.wnylc.net/pb/ docs/ll-ocfs-adm-03.pdf, cached at http://www.nycourts.gov/reporter/webdocs/ ll-ocfs-adm-03.pdf; see also http://ocfs.ny.gov/kinship/support_docs.asp.

. Family Court is still somewhat involved since the parties may come back to court to resolve any disputes, and to modify the kinship guardianship order. (See Family Ct Act art 6.)

. In the case at bar, Mr. G. retains his parental rights. There has never been a neglect finding against him, the TPR petition against him was dismissed with prejudice, and he never surrendered his parental rights. He continually asserts that he wishes to have contact with his children.

. Upon consent of the parties, the testimonial and documentary evidence adduced at the TPR trial was considered as part of the kinship guardianship record.

. The children are now both teenagers.

. What is certain is that the children and Mr. G. have been victims of parental alienation. It occurred over the children’s many years in T.H.’s home. The most likely scenario is that it was orchestrated by the children’s biological mother, C.C., and acceded to by their foster mother, T.H.

. A confluence of motivations by the mother and the foster mother to avoid a termination of the mother’s parental rights by having the children’s foster parent adopt them. It should be noted that during the course of the kinship guardianship proceedings, C.C. failed to return to court to be cross-examined.

. The court makes this determination as a result of Queens County Family Court security footage Mr. G. entered into evidence which shows T.H. leaving court with the children and meeting with C.C. and S.C.H. T.H. gave an incredible account of that incident when questioned about it at trial.